123　589
129　409

## SHEFTALL *v.* CENTRAL OF GEORGIA RAILWAY CO.

1. One may publish, by speech or writing, whatever he honestly believes is essential to the protection of his own rights or those of another, provided the publication be not unnecessarily made to others than to those who the publisher honestly believes are concerned in the subject-matter of the publication.

2. The statement must be no broader and the publication no wider than the interest to be subserved demands. Care must be taken, not only to keep the statement within proper limits as to its subject-matter, but also that it be not made to those who are wholly without interest in the matter.

3. "Where the expressions employed are allowable in all respects, the manner of the publication may take them out of the privilege."

4. Mere publication to a stranger will not always destroy the privilege, if it appears that the communication, prima facie privileged, was made in the hearing of third persons not legally interested, and whose presence was merely casual and not sought by the publisher.

5. To make the defense of privilege complete, in an action of slander or libel, good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons must all appear. The absence of any one or more of these constituent elements will, as a general rule, prevent the party from relying on the privilege.

6. When a railway company discharges a conductor, and it comes to its knowledge that there are still in his possession tickets of the company which were delivered to him while in its employment, which he at that time had a right to sell, and which he refuses or fails to surrender, the company has a right, in order to protect its own interest, to take such precautions as are reasonably necessary to prevent the use of the tickets by persons not entitled to use them.

7. A publication by a railway company under such circumstances to persons whose knowledge is necessary to its protection is authorized.

8. The publication, however, if couched in terms which would be per se libelous, or libelous if published under circumstances which would make it of such character, would not be privileged, if it was communicated to persons not concerned with the matter of the outstanding tickets, whether such persons be strangers or other employees of the company.

9. The charge of the judge did not distinctly submit to the jury the controlling issue in the case, as to whether the publication was unnecessarily made to others than those concerned in the matter of preventing the use of the unsurrendered tickets.

10. Whether the writing was a libel under the circumstances under which it was published was to be determined by the jury, after taking into consideration the terms of the writing, the circumstances of the publication, their knowledge of the meaning of the words employed, and the impression the use of such words under such circumstances would make upon the mind of a person of average intelligence ; and it was not incumbent upon the plaintiff to prove by witnesses what they understood the writing to mean.

11. The rulings upon evidence were free from error.

Argued June 29, — Decided August 2, — Rehearing denied August 5, 1905.

Action of libel. Before Judge Hodges. City court of Macon. November 29, 1904.

Sheftall brought his action against the railway company for libel. The petition alleged, in substance, as follows : On November 9, 1902, the plaintiff was discharged from the service of the defendant as a passenger conductor, because of a mistake as to an order. His application for reinstatement was pending until January 3, 1903, when it was finally refused. When the plaintiff was discharged he had in his possession certain mileage and exchange tickets and sleeping-car and parlor-car tickets which were unused and were good for use over defendant's line of railway, and which had been given the plaintiff as a part of a conductor's equipment. The plaintiff was ready at any time to turn over all of these tickets to the defendant, and defendant knew that fact, but failed to call upon him for them. On the contrary, during all of the period from his discharge until his application for reinstatement was refused plaintiff was led to believe that he would be reinstated. Notwithstanding this, the defendant maliciously, and with the intent to injure the plaintiff's good name, credit, peace, and happiness, and to expose him to public hatred, contempt, and ridicule, did compose and publish, by and through certain named officials, a false, scandalous, malicious, and defamatory circular, of which the following is a copy:

"Central of Georgia Railway Company. Passenger Department. Circular No. 3737. File No. ——— X. 6111.

"Savannah, December 31st, 1902.

" All Passenger Conductors .

### BULLETIN.

" Tickets lost and scalped :— Mileage Exchange Tickets Form M. E. T. Nos. A–4630 to 4649 inclusive, also Parlor and Sleeping-car tickets, Form S. C. Nos. T–6110 to 6199 inclusive.

"Mr. W. C. Sheftall, formerly employed by this company as conductor on the second division, upon leaving the service of the company failed to surrender: [here follows a description of the tickets described above.]    If any of the tickets described above are presented for transportation, you must decline to honor them; if possible, lift tickets and send them to General Passenger Agent, with full particulars.    Conductors of trains upon which sleeping-cars are operated will please instruct porters fully in regard to the outstanding sleeping-car tickets.

"W. A. Winburn, V. P. & T. M. J. C. Haile, G. P. A. F. J. Robinson, A. G. P. A."

Copies of this bulletin were sent to many of the passenger conductors of the defendant, about forty-five in number, and to some of its division superintendents in the county of Bibb and to five or more conductors within that county.    The circular was also posted by the defendant on what is known as its bulletin boards in its offices in the cities of Macon, Atlanta, Savannah, and at other places where the defendant does business, and was allowed to remain in a public and conspicuous place for a period of ten or more days.    All employees of the defendant were required to examine this bulletin, and the office in which it was placed was open to and frequented by the public.    In this manner the libelous matter was published where it was read by divers other persons besides the officers and employees of the defendant.    Plaintiff is the Sheftall referred to in the bulletin, and the defendant intended thereby to charge him with having unlawfully disposed of the tickets referred to and appropriated the proceeds to his own use, and with being a dishonest person defrauding the defendant by unlawfully selling its property which had been entrusted to his care, and the language of the bulletin was in effect a statement and intimation that the tickets had been unlawfully and fraudulently disposed of by the plaintiff, and was in effect a charge that he had been guilty of the crime of embezzlement or larceny after trust.    The defendant filed an answer, in which it admitted that the circular was prepared by its officers and agents, but denied that it was published maliciously, or with any purpose to injure or defame the plaintiff, and also denied that it was published to the general public; and specially pleaded that the preparation of the bulletin and placing it in the hands of its pas-

senger conductors was a communication which is privileged under the law, it being made by parties interested in a business, and pertaining to a matter connected with their interest, and being made, with the bona fide intent to protect the company's interest, to persons interested in the same business, and without any malice either in its preparation or the manner of its publication. The jury returned a verdict for the defendant, and the plaintiff complains of the overruling of his motion for a new trial.

*Marion W. Harris, John R. Cooper, Joseph H. Hall*, and *Claud Estes*, for plaintiff.

*Hall & Wimberly* and *J. E. Hall*, for defendant.

COBB, J. 1–5. Statements made with the bona fide intent, on the part of the person making them, to protect his own interest in a matter where it is concerned are under the law privileged communications. Civil Code, § 3840. The privilege thus given by the law must not be used as a cloak for venting malice; and if the statement is not made in good faith, in promotion of the object for which the privilege is granted, the party defamed has a right of action. Civil Code, § 3841. The statement must be no broader than the interest to be subserved demands. The persons to whom the statement is published must be limited to those to whom the interest to be promoted requires that the information should be given. If it be published to strangers wholly without interest in the matter, the communication loses its privilege. Care must be taken that the words reach only those who are concerned to hear them. If one deliberately adopts a method of communication which gives unnecessary publicity, this is a circumstance to be considered by the jury in determining whether the statement was really made in good faith. Care must also be taken not to embrace within the statement matter wholly unnecessary for the protection of the interest intended to be subserved by the communication. Exaggerated expressions must be avoided; for the privilege may be lost by the use of intemperate and violent language, when the circumstances are such that utterances of such character are clearly uncalled for. Odgers on Libel and Slander (text-book series), t. p. 184. Mr. Townshend says: "We venture, with much hesitation, to suggest the rule as to privilege to be: one may publish, by speech or writing, whatever

he honestly believes is essential to the protection of his own rights, or to the rights of another, provided the publication be not *unnecessarily* made to others than to those persons whom the publisher honestly believes can assist him in the protection of his own rights." Townshend on Libel and Slander (4th ed.), t. p. 301. "Where the expressions employed are allowable in all respects, the manner of the publication may take them out of the privilege." Newell on Slander and Libel (2d ed.), § 66, p. 477. But mere publication to a stranger will not always destroy the privilege, if it appears that the communication, prima facie privileged, was made in the hearing of third persons not legally interested, when the presence of such persons was merely casual and not sought by the defendant; or if it appears that the presence of the third persons at the time of the publication was due to the act or conduct of the party complaining, the privilege would not be lost. Townshend on Libel and Slander (4th ed.), § 244 et seq.; Odgers on Libel and Slander (text-book series), t. p. 184 et seq. But it would be otherwise if the defendant purposely sought an opportunity of making a communication prima facie privileged, in the presence of the very persons who were most likely to act upon it to the prejudice of the plaintiff. Newell on Slander and Libel (2d ed.), § 66, p. 477. To make the defense of privilege complete in an action of libel, good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only, must appear. The absence of any one or more of these constituent elements will, as a general rule, prevent the party from relying upon the privilege. All of these questions are, however, questions of fact for the jury to determine, according to the circumstances of each case, under appropriate instructions from the court.

6–8. The defendant company having discharged the plaintiff from its service, when it came to its knowledge that there were in his possession tickets which had been delivered to him, which while in its employment he would have had a right to sell, and which he had either failed or refused to surrender, the company had a right, in order to protect its own interest, to take such precautions as were necessary to prevent the use of the tickets by persons not entitled to use them. As the conductors upon the

trains were the employees to whom these tickets would be presented in the event they fell into the hands of persons not entitled to them, the company had a right to communicate to these employees the fact that the tickets were outstanding, accompanying this statement with instructions as to what should be done by them whenever the same were presented. The communication, therefore, to the conductors through the medium of the division superintendents and to any other employees who were apt to be misled by these tickets being presented by persons not entitled to them, such as porters upon sleeping-cars, was a communication made by the railroad company for the protection of its interest; and, if couched in language no broader and no stronger in its terms and in its effect than was necessary for this purpose, would be a privileged communication within the meaning of the law, provided of course it was made for the sole purpose of protecting the interest of the company, and not for the purpose of injuring the plaintiff. This much was strongly intimated by Mr. Justice Lamar when the case was here upon a former occasion. *Central of Ga. Ry. Co.* v. *Sheftall*, 118 *Ga.* 867 (2). While the controversy now before us grows out of the same transaction referred to in the case just cited, the present case is not the same case that was here before; for it appears that the present petition was filed after the decision of this court, and embraces not only what was alleged in the petition in the former case, but also what was sought to be inserted therein by amendment, and other allegations in reference to publication to persons other than employees at different points along the line of railway. It appears from the petition, as well as from the evidence, that the publication of this bulletin was not limited to those employees whose duties were connected with tickets, but that the bulletin was posted in various places in the offices of the company where it was not only the right of all the employees, but the duty of a large number of employees other than conductors and employees connected with tickets, to read the same; and in addition to this, there is evidence that at some of the places, while the public was not expected to come to the offices where the bulletin was posted, still members of the public were allowed there, and some persons not connected with the company in any way did actually read

the bulletin. If the presence in those places of persons not connected with the company was merely casual, and from all the circumstances as to the manner and the place in which the bulletin was posted it was apparent that the company did not intend the publication for the public, the fact that one or more persons casually passing through the office had seen the bulletin would not alone be sufficient to destroy the privilege. It would be a question for the jury whether the business of the company at the place the bulletin was posted was carried on in such a way that the company must have known, at the time the bulletin was posted, that persons other than employees would probably read the same. But the company knew that the bulletin in this place would be read by a large number of employees who had no concern whatever with the matter to which it referred; and the mere fact that the persons who saw and read it were employees does not make the communication privileged, unless it was necessary for the protection of the company that these employees should know of the matter.

If the company had reason to believe that its interests were imperiled by the failure or refusal of the plaintiff to deliver these tickets, it had the right to communicate to its employees connected with that department of the work where the tickets would be used the facts in relation to them, with appropriate instructions as to what should be done in case they were presented. But it was in no way necessary that these facts should be communicated to the large body of its employees without reference to whether they had any connection with this department of its business. If in its system of business its bulletins are so posted as to be read by all of its employees without reference to whether they have any connection with the matter stated in the bulletin, the company must take care that the bulletins are couched in such terms that they will not be defamatory of any person. The company was privileged through its bulletin to submit to its conductors, division superintendents, and even porters of sleeping-cars, statements and instructions on the subject of the tickets; and if it made a mistake honestly and in good faith, the person injured would be remediless. But if it spoke to the large body of its employees who had no concern in the matter, and if the bulletin was so worded as to be libelous in its terms, or libelous

under circumstances which were probably known to those who read, the company must be satisfied to rest under the same liability that any other would rest who frames and publishes a libel. It was not at all necessary that the name of Sheftall should have been embraced in the bulletin. Neither was it necessary that the expression "tickets lost and scalped" should have been used. The purpose of the bulletin could have been fully accomplished by omitting those words and all reference to Sheftall, giving merely the numbers of the tickets and the instructions with reference thereto. 'The company had the right, however, to use the name of Sheftall, if it had reasonable grounds to suspect that he was misappropriating, or would misappropriate, the tickets, and to use words that would convey that idea in communicating the facts to employees who were concerned with the tickets. But if in communicating the facts to other employees it used the name of Sheftall in a connection which would carry the implication that he had been guilty of wrong-doing, it has no right to claim the privilege of the law.

9. The court in the opening of its charge stated to the jury the substance of each of the allegations in the petition, following such statement with the defendant's reply thereto; but there was no distinct, clear, and unequivocal submission to the jury, in the main body of the charge, as to the effect upon the claim of privilege of the fact that the defendant unnecessarily published the communications to those who had no concern with the subject-matter thereof. This was the gist of the plaintiff's case. He could not hope to recover under the evidence if the publication was only to the conductors and to other employees connected with the ticket department of the company. His right to recover, if any exists at all, is upon the claim that this communication, privileged as to one class of employees, was published to another class of employees, when the right to publish to them was not embraced within the privilege of the law, or that it was published to others than employees, and that the publication was either intentional, or it was due to negligence in the manner of publication to proper employees. We think this was such a vital issue in the case that the plaintiff was entitled to a clear and specific instruction on the subject, even though no written request was made therefor.

10. When the case was here before, it was held that it was a

question for the jury to determine whether the words complained of were really libelous under the circumstances and that those who read understood them in the sense alleged. 118 *Ga.* 867. See also *Holmes* v. *Clisby*, 118 *Ga.* 820. It was not intended, in the language used by the learned Justice who wrote the opinion in the case, to lay down the rule that it was a part of the plaintiff's case to show, as a matter of affirmative proof, what was understood by each person who read the bulletin; but it was intended to mean that the jury should be left to determine whether the language of the publication, under the circumstances in which it was published, would convey to the mind of an ordinary person, that is, a person of average intelligence, that Sheftall was charged with an intentional and .wilful misappropriation of the property of his former employer, and that he was for that reason guilty of a crime against the laws of the State. It may be that many persons would read the bulletin and be able to swear that no such impression was made upon their minds, and it may be that many other persons could swear to the contrary. But this was a question to be determined, not by witnesses, but by the jury, and it was for them to say whether the writing, under all the circumstances, was such as inevitably to convey to the mind of a man of average intelligence the impression that Sheftall had misappropriated the property of his employer. If the jury were to reach this conclusion, taking into consideration their knowledge of the meaning of the words, the impression they carried, and the circumstances under which they were used, it was not incumbent upon the plaintiff to prove any more than that some person other than those who were entitled to read the bulletin actually read it. Any .persons who read the bulletin could be called as witnesses to testify as to the impression made upon their minds as a result of such reading, to aid the jury in determining the question of libel or no libel, but their evidence would not be conclusively binding on the jury as to the character of the writing and its true meaning under the circumstances in which it was published.

11. The motion for a new trial complains of various parts of the charge, but we do not deem it necessary to refer to these assignments of error in detail. Some of them were not at all in accord with the views above expressed, and there were some inaccuracies

in the charge which will be apparent to the judge on another trial, when what is now said is read in connection with what was said by Mr. Justice Lamar when the case was here before. The motion also contains complaints of certain rulings upon the admission of evidence. The plaintiff sought to prove the effect of the publication upon members of his family when the matter was discussed at home. We think this evidence was properly rejected. If the writing was a libel, it could have no other effect than an injurious one upon the feelings of any one interested in the plaintiff, and human experience, and not direct testimony, was all that was necessary to convey this to the jury. It was also sought to prove by the plaintiff that the libel had injuriously affected him with his friends and that their conduct had changed towards him. This was also properly rejected; for the same human experience which would enable the jury to say that a man's family would be harassed and distressed by the publication would enable them to ascertain that it would have the effect to estrange his friends.

*Judgment reversed.   All the Justices concur, except Simmons, C. J., absent.*